Filed 8/3/22; Opinion on transfer from Supreme Court

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PEDRO LOPEZ,<br><br>    Defendant and Appellant. | F076295<br><br>(Super. Ct. No. VCF325028TT)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian,[†] Judge.

Benjamin Owens, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Julie A. Hokans, Christopher J. Rench, and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II.D., and III through V.

[†]Retired judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Pedro Lopez (defendant) was one of several Norteño gang members found guilty of conspiring to commit two home invasion robberies. Law enforcement agencies were already conducting a wiretapping operation when the conspiracy began to develop. As a result, the perpetrators were apprehended while driving to the targeted homes and the robberies were never committed. Defendant appeals from a judgment of conviction on counts of unlawful possession of a firearm and ammunition; attempted robbery; conspiracy to commit robbery; and a violation of the gang conspiracy statute, Penal Code section 182.5 (all undesignated statutory references are to the Penal Code). The judgment also includes gang enhancements imposed under section 186.22, subdivision (b)(1).

In a previously issued opinion, we evaluated defendant's claims of insufficient evidence, instructional error, and sentencing error. In particular, defendant's challenge to the imposition of a life sentence for conspiracy to commit home invasion robbery was rejected. The California Supreme Court later granted review as to one issue: whether the trial court erred by sentencing defendant to the alternate penalty prescribed by section 186.22, subdivision (b)(4) based on gang-related conspiracy convictions. Holding the alternate penalty of a life term does not apply to such convictions, the high court reversed our prior decision "with instructions to remand for resentencing." (*People v. Lopez* (2022) 12 Cal.5th 957, 976.)

While the matter was pending before the high court, the Legislature enacted Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333). This legislation amended multiple parts of section 186.22 and added a new statute, section 1109. Section 1109 provides for bifurcated trial procedures in cases involving gang charges under section 186.22, subdivisions (a), (b), and/or (d). The California Supreme Court declined to consider whether or to what extent Assembly Bill 333 applies to defendant's case, "leav[ing] the subject for consideration by the Court of Appeal on remand." (*People v. Lopez*, *supra*, 12 Cal.5th at p. 976, fn. 12.)

2.

In supplemental briefing, defendant argues the recent amendments to section 186.22 apply retroactively.  Because the gang conspiracy statute incorporates provisions of section 186.22 to define the elements of the offense, defendant contends Assembly Bill 333 requires reversal of the gang enhancements *and* his conviction under section 182.5. Defendant also claims section 1109 applies retroactively.  Therefore, pursuant to a theory the gang evidence tainted all of the jury's verdicts, defendant argues for reversal of the entire judgment and "a new trial in which trial on the gang conspiracy count and gang enhancement allegations is bifurcated from the trial on the other counts."

The People contend Assembly Bill 333 applies retroactively only in relation to section 186.22, not section 1109, and has no application to the gang conspiracy statute. They argue that construing Assembly Bill 333 as having any effect on section 182.5 would constitute a prohibited amendment to a law enacted by voter initiative.  We find the argument unsound and hold Assembly Bill 333's amendments to section 186.22, subdivisions (e) and (f), lawfully apply to the gang conspiracy statute.

There is a split of authority on the retroactive application of section 1109. Whether section 1109 applies to section 182.5, retroactively or otherwise, would be an issue of first impression.  It is unnecessary to reach either issue because any arguable error in failing to bifurcate the gang charges was nonprejudicial.  We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

The People's evidence showed, under the law predating Assembly Bill 333, that the Norteños are a criminal street gang with members located throughout the Central Valley of California.  Defendant was affiliated with a Norteño "subset" in Fresno County called Varrio East Side Reedley.  Gang members from other subsets or "cliques" also participated in the underlying events, and there are no issues regarding the perpetrators' common ties to an overarching criminal enterprise.

In 2015, multiple law enforcement agencies conducted a joint investigation into the activities of Norteño gang members in Tulare County. Operation Red Sol involved the wiretapping of phones used by certain high-ranking members, including Emanuel Avalos, Rigoberto Benavidez, and Pedro Sanchez. Sanchez held the position of "regiment commander" and was considered "the boss of Tulare County." Avalos lived in Lindsay and held the subordinate position of "south county leader." Investigators believed Benavidez was in the process of "taking over Madera County," which suggested he and Sanchez were similarly situated within the gang's organizational hierarchy.

On August 24, 2015, law enforcement agents listened as Sanchez, Benavidez, and Avalos began recruiting people for a "job" in Visalia. Sanchez communicated with defendant by phone and via text messaging, and defendant agreed to meet up with the "workers" that evening. In a separate message exchanged between Sanchez and Benavidez, Sanchez remarked, "This is a good lick and great opportunity." The agents understood the word "lick" to be a slang term for robbery.

In addition to monitoring the electronic communications, agents conducted visual surveillance outside of Avalos's home in Lindsay and Benavidez's apartment in Visalia. At approximately 4:00 p.m., Sanchez and Avalos met at Avalos's residence with a gang member named Luis Corona and several unidentified Hispanic males. Corona subsequently departed in a white Nissan Altima.

Over the next few hours, the involved parties alluded to a plan for the robbers to impersonate agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). Conversations between Sanchez and Avalos specified that uniforms would be provided and everyone would be armed with guns. Benavidez worked on finding a suitable place for the men to convene before and after the robberies. Earlier in the day, he had asked the central county leader, Val Ornelas, for assistance in locating a safe house near Pinkham Street, "anywhere from Lovers Lane to Ben Maddox [Way] and from Noble [Avenue] to Tulare [Avenue]."

4.

Shortly after 7:00 p.m., Benavidez drove to the 1100 block of Pinkham Street and met up with four people in a white Nissan Altima, which had just driven there from Avalos's residence. Avalos's brother, Cervando, was among the group of people in the white car. Both vehicles then drove to Benavidez's apartment complex on South Encina Street.

Benavidez called Sanchez to tell him the designated meeting place could not be used and everyone should meet at his apartment. Sanchez sent defendant a message informing him of the change, and defendant proceeded to contact Benavidez for directions. At approximately 7:35 p.m., defendant and a group of unidentified passengers arrived at Benavidez's apartment in a silver BMW.

At 7:47 p.m., Cervando Avalos began making a series of calls to his brother and Sanchez to complain about defendant's crew being unprepared. There were no ATF uniforms and some people did not have ammunition for their firearms. They were also in need of a second vehicle. Cervando said defendant's BMW had "dealer plates" and other distinctive features that made it "too easy to spot." When apprised of the situation, Sanchez authorized a 24-hour postponement. While Cervando was talking to Sanchez, defendant's group left to obtain bullets and returned a few minutes later.

During a subsequent phone call between the Avalos brothers, Emanuel asked to speak with whomever was "in charge there." Defendant came on the line and provided a status report, claiming they were "stocked up" with weapons and had two bulletproof vests. Emanuel asked, "Is there anything on there that says ATF?" Defendant said no and described the attire as "SWAT gear."

Agents conducting aerial surveillance observed defendant's BMW leave the apartment complex again and drive to the vicinity of Pinkham Street and Noble Avenue. The car drove slowly through a neighborhood before returning to Benavidez's apartment at approximately 8:29 p.m. About 30 minutes later, Benavidez sent the following text message to Sanchez: "'The homie went by the layout. I think we can handle it. The

5.

little homie just needs a few more [people].'"  Sanchez replied that he had a crew "'ready to go'" and would "'be on it tomorrow.'"

On August 25, 2015, defendant sent a text message to Sanchez:  "'On track, brother, so you know[,] [I am] here in your area doing a bit more homework on the two job sites.'"  Sanchez replied, "'Okay.  [We'll] give it another try tonight.  I'll be with you shortly with some ideas.'"  Later that afternoon, Sanchez exchanged the following text messages with a person named Ricardo Reyes:

| | |
|---|---|
| Sanchez: | "'Need two to three people for two pads [houses].  They'll be part of a team tonight in [Visalia].  We've been doing homework for two days and tonight's a go.  Are you [in]?'" |
| Reyes: | "'[Yes.]  I got the squad already, too.  What is it, though, and is it worth it?'" |
| Sanchez: | "'It's two pads … square people.  They got safes and guns and gold. Just bring bangers [guns].'" |
| Reyes: | "'Got 'em.  What part of Visa[lia]?'" |
| Sanchez: | "'By Walmart off Ben Maddox.'" |
| Reyes: | "'How much people in each pad?'" |
| Sanchez: | "'[They're neighboring houses.]  [One] has two people.  One has one.  Old lady and a husband and wife ….  It's easy.  Got to be quick.'" |
| Reyes: | "'Oh, we'll be fast.  Who is gonna show us where it's at and [it's] a for sure one right?'" |
| Sanchez: | "'Yes, we have a safe spot close by where we will meet up.'" |

Due to problems acquiring one or more stolen vehicles, which apparently were preferred over cars that could be traced back to them, the participants decided to use the white Nissan Altima and Emanuel Avalos's white Ford Explorer.  Emanuel planned to wait in his vehicle during the robberies and then use it to transport the loot.  He and gang member Juan Hinojosa discussed tying up the victims to prevent them from seeing the

6.

cars. When Emanuel expressed concern about waiting outside without a gun, Hinojosa reminded him, "It's an old guy and an old lady."

At approximately 7:12 p.m., Sanchez sent a text message to Reyes confirming that the "'thing'" in Visalia was "'[i]n process.'" At 7:24 p.m., defendant texted Sanchez to say he was "'[h]eading that way.'" At approximately 7:53 p.m., after his BMW had pulled up to Benavidez's apartment complex, defendant sent another message: "'We here.'" During the same general timeframe, Avalos informed Sanchez that his group was almost in Visalia and were "'ready to move once at the house.'"

At 8:03 p.m., the BMW moved to an adjacent street. The Nissan Altima and Ford Explorer arrived a few minutes later. At approximately 8:20 p.m., the BMW's occupants got into the other vehicles, which then began driving toward Noble Avenue.

At 8:28 p.m., Emanuel Avalos sent a message to Sanchez: "'We in motion. I'll update you soon.'" About a minute later, police attempted to stop the Altima. The lights and siren of a marked patrol car were activated as the Altima was driving east on Noble Avenue, past the Ben Maddox Way intersection and heading toward the Walmart referenced in Sanchez's text messages. The Altima accelerated and a high-speed chase ensued, which continued until the car sustained damage driving over a median. The five occupants, including defendant, fled on foot but were quickly apprehended.

A search of the Altima yielded a 22-caliber AR-style rifle and a pair of black latex gloves. A mask and second pair of gloves were found outside the vehicle, and four additional firearms were seized in conjunction with the suspects' arrests. Most of the firearms had been discarded and/or hidden in areas near where the suspects were detained. The guns were loaded, and one had been wrapped up inside of a ski mask.

Defendant's case was severed from a larger prosecution of dozens of people. He was charged with conspiracy to commit "home invasion robbery" (see §§ 182, subd. (a)(1), 211, 213, subd. (a)(1)(A); counts 19 & 162); participation in a "criminal street gang conspiracy" to commit the same target offense (see § 182.5; count 20); possession

7.

of a firearm by a convicted felon (§ 29800, subd. (a)(1); count 156); unlawful possession of ammunition (§ 30305, subd. (a)(1); count 160); and "attempted home invasion robbery" (see §§ 664, 211, 213, subd. (a)(1)(A); count 163). (Original capitalization omitted.) Each offense was alleged to be gang related within the meaning of section 186.22, subdivision (b)(1).

Counts 19, 20, and 162 were alleged to be punishable by an indeterminate life term under section 186.22, subdivision (b)(4). Defendant was further alleged to have suffered a prior strike and serious felony conviction (§§ 667, subds. (a)(1), (b)–(i), 1170.12), and to have served two prior prison terms within the meaning of section 667.5, former subdivision (b). A firearm enhancement was pleaded pursuant to section 12022.53, but the People did not submit the allegation to the jury.

The People's case established the facts summarized above. The defense rested without presenting any evidence. Defendant was convicted as charged (except for the firearm enhancement) and sentenced to 35 years to life in prison plus a consecutive determinate term of 19 years. Sentencing details are provided in the final section of the opinion.

## DISCUSSION

### I. Attempted First Degree Robbery[*]

Defendant claims the People failed to prove the elements of attempted robbery as alleged in count 163. "On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt." (*People v. Boyer* (2006) 38 Cal.4th 412, 479.) We construe the record in the light most favorable to the judgment and presume "'the existence of every fact the jury could reasonably have deduced from the evidence.'" (*People v. Mendez* (2019) 7 Cal.5th 680, 702.)

---

[*]See footnote, *ante*, page 1.

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Section 212.5 divides the offense into degrees, and "every robbery which is perpetrated in an inhabited dwelling house" constitutes "robbery of the first degree." (*Id.*, subd. (a).) Harsher punishment is imposed for robberies committed "in concert with two or more other persons … within an inhabited dwelling house." (§ 213, subd. (a)(1)(A).) The aggravated form of first degree robbery is commonly referred to as "robbery in concert" or "home invasion robbery." (*People v. Jones* (2012) 54 Cal.4th 350, 367; *People v. Epperson* (2017) 7 Cal.App.5th 385, 391.)

A criminal attempt consists of two elements: the specific intent to commit a crime and "a direct but ineffectual act done toward its commission." (§ 21a.) Case law describes the second element as an "overt act" requirement. "The overt act element of attempt requires conduct that goes beyond 'mere preparation' and 'show[s] that [defendant] is putting his or her plan into action.'" (*People v. Watkins* (2012) 55 Cal.4th 999, 1021, quoting *People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8 (*Decker*).) Therefore, attempted robbery requires the specific intent to commit robbery and an overt act toward its commission that goes beyond planning or preparation.

"'[P]reparation consists of devising or arranging the means or measures necessary for the commission of the offense, while the attempt is the direct movement toward its commission after the preparations are made.'" (*People v. Memro* (1985) 38 Cal.3d 658, 698, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) "[W]hen the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is underway …." (*People v. Dillon* (1983) 34 Cal.3d 441, 455 (plur. opn. of Mosk, J.) (*Dillon*).)

In *People v. Bonner* (2000) 80 Cal.App.4th 759, the appellant was convicted of attempted robbery despite never encountering his intended victims. Michael Bonner had inside information about a hotel manager's routine of transporting cash to a bank. With a

9.

plan to rob the manager and his assistant as they were leaving the building, Bonner went to the hotel and hid in a garage-level laundry room while armed and wearing a mask. The housekeeping staff walked in on him, and he fled the scene. (*Id*. at pp. 761–762.) In upholding the conviction, the appellate court noted that an overt act need not be "the last proximate or ultimate step toward commission of the crime." (*Id*. at p. 764, citing *People v. Kipp* (1998) 18 Cal.4th 349, 376.)

The dividing line between acts of preparation and a criminal attempt "depends upon the facts and circumstances of a particular case." (*Decker*, *supra*, 41 Cal.4th at p. 14.) "Although a definitive test has proved elusive, [courts] have long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.'" (*Id*. at p. 8, quoting *People v. Anderson* (1934) 1 Cal.2d 687, 690 (*Anderson*).) The stronger the evidence of intent, "the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement." (*Dillon*, *supra*, 34 Cal.3d at p. 455 (plur. opn. of Mosk, J.).) In other words, "[w]here the intent to commit the crime is clearly shown, an act done toward the commission of the crime may be sufficient for an attempt even though that same act would be insufficient if the intent is not as clearly shown." (*People v. Bonner*, *supra*, 80 Cal.App.4th at p. 764.)

Defendant's opening brief factually distinguishes this case from *Dillon*, *Anderson*, and *People v. Vizcarra* (1980) 110 Cal.App.3d 858, each of which involved would-be robbers who, in defendant's words, reached "the immediate vicinity of the location" of the intended crime. In *Anderson*, where the California Supreme Court first adopted the slight acts rule, the brandishing of a firearm roughly two feet away from a theater's ticket window was held to constitute attempted robbery. However, the high court described the appellant's "conduct in concealing the gun on his person and going to the general vicinity" of the theater as "mere acts of preparation." (*Anderson*, *supra*, 1 Cal.2d at p. 690.) In *Vizcarra*, the appellant's movement toward a liquor store while armed with a

10.

rifle was deemed "a sufficient direct act toward the accomplishment of the robbery" in light of his effort to "hide on the pathway immediately adjacent to the liquor store when observed by a customer." (*Vizcarra*, *supra*, 110 Cal.App.3d at p. 862.) In *Dillon*, the appellant committed attempted robbery by breaching the outer perimeter of a marijuana farm—which he knew to be guarded—while he and his accomplices were in possession of "guns, knives, clubs, masks, rope, and strips of sheeting." (*Dillon*, *supra*, 34 Cal.3d at pp. 455–456 (plur. opn. of Mosk, J.); see *id*. at p. 451.)

Defendant claims he did not get close enough to the targeted houses to commit attempted home invasion robbery. In response, the People rely on the slight acts rule and characterize the "general vicinity" statement in *Anderson* as obiter dictum. (*Anderson*, *supra*, 1 Cal.2d at p. 690; see *Childers v. Childers* (1946) 74 Cal.App.2d 56, 61–62 ["There is no kinship between stare decisis and obiter dictum. Whatever may be said in an opinion that is not necessary to a determination of the question involved is to be regarded as mere dictum"].) In his reply brief, defendant argues the *Anderson* dictum was cited approvingly in *People v. Garton* (2018) 4 Cal.5th 485 (*Garton*), which is true. Defendant directs our attention to page 512 of *Garton*, but the more salient reference is made in a string citation to support the following statement: "[O]ur case law does not suggest that a defendant with clearly shown intent need only make preparations or start moving toward the intended victim to be guilty of attempted murder." (*Id*. at p. 514.)

The appellant in *Garton* was a Shasta County resident who had devised an elaborate plot to kill a man who lived in Gresham, Oregon, and worked in the nearby city of Portland. (*Garton*, *supra*, 4 Cal.5th at pp. 490–491, 508–509.) Todd Garton spent months planning the murder and even traveled to Oregon to familiarize himself with the man's home and place of business. (*Id*. at pp. 491, 508.) Garton was having sexual relations with the intended victim's wife, and she was in on the plan. (*Id*. at pp. 490–491.)

11.

In February 1998, Garton and two accomplices "loaded Garton's car with an assortment of guns, ammunition, and knives, as well as a homemade silencer, latex gloves, and two walkie-talkies," and then drove from Shasta County to Gresham, Oregon. (*Garton*, *supra*, 4 Cal.5th at p. 509; see *id*. at p. 496.) They arrived the same day and spent the night at a motel. The next morning, the trio drove to the intended victim's workplace and waited in a parking garage, intending to kill him when he arrived. However, "unbeknownst to Garton, [the wife had told her husband] to drive the larger of their cars, knowing that this car would not fit into the garage where the three men waited. After realizing that [he] had parked elsewhere, the men left.…" (*Garton*, at p. 491; see *id*. at p. 509.)

The relevant issue in *Garton* was whether the trial court had territorial jurisdiction over a charge of conspiracy to commit an out-of-state murder. Under the law in effect in 1998, such jurisdiction would not have existed unless the "acts within California's borders independently constituted an attempt to commit murder." (*Garton*, *supra*, 4 Cal.5th at p. 510.) In a four-to-three decision, the California Supreme Court concluded the steps taken by Garton in this state were insufficient to satisfy the overt act element of attempted murder. (*Id*. at p. 513.) Two circumstances were dispositive: First, "Garton's actions in California did not occur in close proximity to the victim or to the anticipated site of the murder in the Portland area." (*Id*. at p. 512.) Second, "Garton's actions in California on February 6, 1998, were temporally separated by one night from his actions in Oregon on the morning of February 7, 1998." (*Id*. at p. 513.) Therefore, "at the moment defendant and his coconspirators entered into Oregon, the plot to kill [the intended victim] was not 'in such progress that it [would] be consummated unless interrupted by circumstances independent of the will of the attempter ….'" (*Id*. at pp. 513–514.)

The facts of this case differ significantly from those in *Garton*. When Garton reached the Oregon border, he was still hundreds of miles away from his intended victim.

12.

(*Garton*, *supra*, 4 Cal.5th at p. 525 (conc. & dis. opn. of Chin, J.).)  Here, defendant was in a car traveling east on Noble Avenue and approaching the intersection of Pinkham Street, i.e., the neighborhood in which the jury impliedly found the targeted homes were located.  The Altima was on course to reach its destination in a matter of minutes or even seconds.[1]  However, in further contrast to *Garton*, defendant's plan was thwarted by police intervention.

If the unlawful design involves "concerted action—and hence a greater likelihood that the criminal objective will be accomplished [citation]—there is a greater urgency for intervention by the state at an *earlier* stage in the course of that conduct."  (*Decker*, *supra*, 41 Cal.4th at pp. 10–11.)  "When a defendant's intent is '"clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime."'"  (*People v. Davis* (2009) 46 Cal.4th 539, 606, quoting *People v. Memro*, *supra*, 38 Cal.3d at p. 698.)  In this instance, police saw a nefarious plot being carried out in real time and intervened after the participants had clearly demonstrated their intent to commit a home invasion robbery.  The question is whether the law required defendant to reach the targeted home or take even further steps toward committing the crime in order for jurors to find the requisite overt act.

"The standard is not that attempt liability attaches when law enforcement may lawfully intercede for investigative or crime prevention purposes."  (*Garton*, *supra*, 4

---

[1]The jury viewed People's exhibit No. 14, which is a video containing 11 minutes of aerial surveillance footage beginning shortly before the Altima departed from Benavidez's apartment complex and ending after its occupants had exited the car and began running from the police.  The recording equipment had mapping software, so the roadways traversed by the vehicle are identified in the video.  The time counter reads 20:29:43 (8:29 p.m. and 43 seconds) at the approximate moment when a police car pulls behind the Altima as it is crossing over South Ben Maddox Way.  The Altima reaches the intersection of East Noble Avenue and South Pinkham Street approximately 35 seconds later, when the counter reads 20:30:18.

Cal.5th at p. 510.)  "If it is not clear from a suspect's acts what he intends to do, an observer cannot reasonably conclude that a crime will be committed; but when the acts are such that any rational person would believe a crime is about to be consummated absent an intervening force, the attempt is underway …." (*Dillon*, *supra*, 34 Cal.3d at p. 455 (plur. opn. of Mosk, J.).)  After careful consideration of the governing principles, we conclude the evidence is sufficient to support the verdict of attempted first degree robbery.  The particular facts and circumstances of this case "would lead a reasonable person to 'believe a crime [was] about to be consummated absent an intervening force'— and thus that 'the attempt [was] underway'" when the police interceded.  (*Decker*, *supra*, 41 Cal.4th at p. 9.)

In a related argument, defendant says "it is unknown whether the intended victims were even home" and alleges "their presence was a condition precedent to an attempted robbery that otherwise would have been a mere burglary."  He cites no authority for this proposition and fails to affirmatively demonstrate error.  It is settled that "the commission of an attempt does not require proof of any particular element of the completed crime," and "a person may be convicted of an attempt to commit a crime he never could have completed under the circumstances." (*People v. Chandler* (2014) 60 Cal.4th 508, 517.)

## II.     Assembly Bill 333

### A.     Overview

Section 186.22 prohibits unlawful participation in a criminal street gang, as set forth in subdivision (a), and includes sentencing enhancement provisions, which are found in subdivision (b).  The statute also has alternate penalty provisions, section 186.22, subdivisions (b)(4), (5), and (d), the latter of which allows for punishment of up to three years in prison if the defendant is "convicted of a gang-related misdemeanor offense." (*People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7.)

14.

A criminal street gang is "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).)

A "'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of" two or more offenses listed in section 186.22, subdivision (e), if such conduct occurred within certain time frames and under particular circumstances specified therein. (§ 186.22, subd. (e)(1).) This is commonly known as the "predicate offenses" requirement. (*People v. Navarro* (2021) 12 Cal.5th 285, 311.)

"The elements of the gang participation offense in section 186.22[,] [subdivision] (a) are: First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (plur. opn. of Corrigan, J.).) The enhancements and alternate penalty provisions apply only to gang-related crimes, meaning offenses "committed for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subds. (b), (d); accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) The enhancements and alternate penalties further require "the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subds. (b)(1), (4), (d).)

By enactment of Assembly Bill 333, section 186.22 has new requirements for establishing liability under subdivisions (a), (b), and (d). (Stats. 2021, ch. 699, § 3.) As of January 1, 2022, predicate offenses must be shown to have "commonly benefited" the alleged gang, and the common benefit must have been "more than reputational."

15.

(§ 186.22, subd. (e)(1).) Currently charged offenses no longer qualify (*id*., subd. (e)(2)), and at least one predicate offense must have been committed "within three years of the date the current offense is alleged to have been committed …" (*id*., subd. (e)(1)). Among other additional changes, the terms "benefit," "promote," "further," and "assist" are now defined to mean providing "a common benefit to members of a gang where the common benefit is more than reputational." (*Id*., subd. (g).)

Assembly Bill 333 also added section 1109. (Stats. 2021, ch. 699, § 5.) The new statute provides:

> "(a) If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section 186.22 shall be tried in separate phases as follows:

> "(1) The question of the defendant's guilt of the underlying offense shall be first determined.

> "(2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement under subdivision (b) or (d) of Section 186.22, there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. Allegations that the underlying offense was committed for the benefit of, at the direction of, or in association with, a criminal street gang and that the underlying offense was committed with the specific intent to promote, further, or assist in criminal conduct by gang members shall be proved by direct or circumstantial evidence.

> "(b) If a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22."

## B.     Retroactivity of Amendments to Section 186.22

Section 3 states that no part of the Penal Code is retroactive "unless expressly so declared." However, in *In re Estrada* (1965) 63 Cal.2d 740, an amendment to a criminal statute was held to apply retroactively despite the Legislature's failure to expressly declare such an intent. (*Id*. at pp. 742–745.) The rationale for this outcome has come to

16.

be known as the "*Estrada* rule." (E.g., *People v. Frahs* (2020) 9 Cal.5th 618, 624.)  In brief, "[w]hen new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 673.)

The *Estrada* rule has been applied "to statutes that merely made a reduced punishment *possible*." (*People v. Frahs*, *supra*, 9 Cal.5th at p. 629.)  In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, the inference of retroactivity was extended to legislation that "ameliorated the possible punishment for a class of persons." (*Id*. at p. 308.)  In *Frahs*, a pretrial diversion statute (§ 1001.36) was held to apply retroactively because it "offers a potentially ameliorative benefit for a class of individuals—namely, criminal defendants who suffer from a qualifying mental disorder." (*Frahs*, at p. 631.)

"[I]n order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'" (*People v. Frahs*, *supra*, 9 Cal.5th at p. 634.)  Assembly Bill 333 "increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement" (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344), which obviously confers potentially ameliorative benefits upon a class of persons to which defendant belongs. (See *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301 [*Estrada* rule applies "to statutes which redefine, to the benefit of defendants, conduct subject to criminal sanctions"].)  Because there is no clear indication of legislative intent for prospective-only application, we conclude the amendments to section 186.22 apply retroactively in this case.

The People appropriately concede defendant's arguments for reversal of the gang enhancements.  As discussed in their briefing, the trial evidence addressing the predicate offenses requirement was insufficient under the current version of section 186.22.  "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the

17.

affected charges." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480; accord, *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–823 & fn. 19.)

## C. Constitutionality of Impact on Section 182.5

There is a split of authority on the constitutionality of Assembly Bill 333 as applied in certain contexts. The issue first arose in cases involving allegations pleaded under section 190.2, subdivision (a)(22) (section 190.2(a)(22)). This case presents the first challenge made in relation to section 182.5. We will briefly discuss the emerging case law before explaining why we are unpersuaded by the People's position.

In *People v. Lopez*, *supra*, 73 Cal.App.5th 327, the Second Appellate District, Division Eight, concluded "Assembly Bill 333's changes to section 186.22 affect not only the gang enhancement allegations under that statute but other statutes that expressly incorporate provisions of section 186.22," including section 190.2(a)(22). (*Lopez*, at p. 346.) Section 190.2(a)(22) was enacted as part of Proposition 21, an initiative measure approved by the electorate in the March 2000 primary election. (*People v. Shabazz* (2006) 38 Cal.4th 55, 64–65.) Section 190.2(a)(22) makes first degree murder a capital crime if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang." (Italics added.)

The Second Appellate District's *Lopez* opinion holds that because "the definition of a criminal street gang has been narrowed by Assembly Bill 333 and new elements added in order to prove a criminal street gang and a pattern of criminal activity," the requirements for proving a gang special circumstance under section 190.2(a)(22) have likewise changed.[2] (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 347.) In *People v.*

_____

[2]The People note there is no indication the appellate panel in *Lopez* considered the constitutional ramifications of this holding. (See *People v. Lopez*, *supra*, 73 Cal.App.5th at pp. 343–347.)

*Rojas* (2022) 80 Cal.App.5th 542 (*Rojas*), a divided panel in our district reached the opposite conclusion. The *Rojas* majority held that "[b]ecause Assembly Bill 333 'takes away' from the scope of conduct that Proposition 21 made punishable under section 190.2" (*id*. at p. 555), "it is unconstitutional to the extent it would amend that initiative" (*id*. at p. 557).

The *Rojas* majority relied on the fact that California voters restricted the Legislature's ability to amend the provisions of Proposition 21. The majority's reasoning was as follows: "While the Legislature was free to amend Proposition 21 …, it could only do so with a two-thirds vote in each house. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, … § 39, p. 131.) Assembly Bill 333 did not comply with that requirement and therefore cannot amend Proposition 21." (*Rojas*, *supra*, 80 Cal.App.5th at p. 555.) In practical effect, *Rojas* holds that a special circumstance murder allegation under section 190.2(a)(22) may be proven based on a different, less restrictive definition of a "criminal street gang" than is found in the current version of section 186.22. (See *Rojas*, p. 558 [holding "Assembly Bill 333 does not alter the scope or effect of section 190.2, subdivision (a)(22)"].)

In *People v. Lee* (2022) __ Cal.App.5th __ [2022 Cal.App. LEXIS 624], Division Four of the Second District concluded Assembly Bill 333 does not unconstitutionally amend section 190.2(a)(22). Focusing on the question of voter intent, the *Lee* court opined there is "nothing to suggest that the electorate intended to impose a time-specific incorporation of the term 'criminal street gang' in the gang-murder special circumstance statute." (*Id*. at p. __ [2022 Cal.App. LEXIS 624, *18].) Accordingly, *Lee* holds "that the term 'criminal street gang' as incorporated in the gang-murder special-circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (*Ibid*., quoting *In re Jovan B*. (1993) 6 Cal.4th 801, 816 & fn. 10.)

We now turn to the gang conspiracy statute, which was also enacted by Proposition 21. Like section 190.2(a)(22), it expressly incorporates specific provisions of

19.

section 186.22. Section 182.5 provides, in relevant part, "[A]ny person who actively participates in any criminal street gang, *as defined in subdivision (f) of Section 186.22*, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, *as defined in subdivision (e) of Section 186.22*, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony and may be punished as specified in subdivision (a) of Section 182." (Italics added.)

The People submit that Assembly Bill 333's "amendment to section 186.22, subdivisions (e) and (f), appears to be an unconstitutional amendment to the criminal street gang conspiracy offense created by the voters via Proposition 21." Although the People's supplemental briefing was filed before *Rojas* was published, their argument tracks the rationale espoused by the *Rojas* majority. Likewise, the People claim there are now two statutory definitions of a "criminal street gang." Although the gang conspiracy statute incorporates the definitions set forth in section 186.22, subdivisions (e) and (f), the People argue those references must be read to mean *as the provisions existed prior to Assembly Bill 333*.

### 1.     Additional Background

Section 186.22 was enacted as part of the California Street Terrorism Enforcement and Prevention Act (STEP Act). (*People v. Brookfield* (2009) 47 Cal.4th 583, 588.) "The Legislature passed the act in order 'to seek the eradication of criminal activity by street gangs by focusing upon patterns of criminal gang activity and upon the organized nature of street gangs, which together, are the chief source of terror created by street gangs.'" (*People v. Mesa* (2012) 54 Cal.4th 191, 196, quoting § 186.21.) "The original STEP Act was an urgency measure that went into effect on September 26, 1988." (*People v. Valencia* (2021) 11 Cal.5th 818, 829, fn. 9.) It was then reenacted in the

Omnibus Motor Vehicle Theft Act of 1989.  (*People v. Lopez*, *supra*, 12 Cal.5th at p. 969.)

Early versions of the STEP Act defined a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in … subdivision (e), which has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (Former § 186.22, subd. (f), as amended by Stats. 1989, ch. 930, § 5.1.)

The STEP Act was amended in 1994 to expand the list of qualifying primary activities and predicate offenses, notably adding the crimes of looting and felony vandalism.  (Former § 186.22, subd. (e)(13), (20), as amended by Stats. 1994, ch. 47, § 1; *People v. Superior Court* (*Johnson*) (2004) 120 Cal.App.4th 950, 957.)  By the latter part of the decade, the STEP Act had "been amended almost every year, sometimes several times in a year," since its original enactment.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 615, fn. 7.)  "This complex legislation became even more so in 2000, when California's voters passed Proposition 21."  (*People v. Brookfield*, *supra*, 47 Cal.4th at p. 588.)

The provisions of Proposition 21 are summarized in *Manduley v. Superior Court* (2002) 27 Cal.4th 537.  "Section 1 sets forth the short title of the measure—the Gang Violence and Juvenile Crime Prevention Act of 1998."[3]  (*Manduley*, at p. 574.)  "Section 2 contains findings and declarations, which refer to the growing problem of juvenile and gang-related violent crime, the inability of the juvenile justice system to protect the public adequately from violent juvenile offenders, the goal of devoting fewer resources of

---

[3]Proposition 21 traces back to proposed legislation sponsored by former Governor Pete Wilson during the 1997–1998 Regular Session.  (*People v. Arroyas* (2002) 96 Cal.App.4th 1439, 1447.)  "Because the Legislature failed to enact the crime bill, Governor Wilson took the legislation to the people of California."  (*Id*. at p. 1448.)

21.

the juvenile court to violent offenders and more to those offenders who can be rehabilitated, the desirability of eliminating confidentiality in some juvenile proceedings in order to hold juvenile offenders more accountable for their actions, and the need to increase penalties for gang-related felonies." (*Ibid*.)

"Sections 3 through 13 of the initiative are related to criminal gang activity." (*Manduley v. Superior Court*, *supra*, 27 Cal.4th at p. 574.) As relevant here, section 3 of Proposition 21 added the gang conspiracy statute (§ 182.5) to the Penal Code. (Voter Information Guide, Primary Elec. (Mar. 7. 2000) text of Prop. 21, § 3, p. 119 (Voter Guide).) Section 4 of Proposition 21 amended multiple provisions of Penal Code section 186.22. (Voter Guide, *supra*, text of Prop. 21, § 4, pp. 119–120.) "Section 11 amends Penal Code section 190.2 to add gang-related murder as a special circumstance permitting the imposition of the death penalty or a sentence of life without the possibility of parole." (*Manduley*, at p. 574; see § 190.2(a)(22).)

"Sections 14 through 17 of Proposition 21 amend portions of the Three Strikes law." (*Manduley v. Superior Court*, *supra*, 27 Cal.4th at p. 574.) "Sections 18 through 34 of Proposition 21 amend provisions of the Welfare and Institutions Code concerning the juvenile justice system." (*Id*. at p. 575.) Sections 35 through 38 of the initiative contain additional declarations of legislative intent and a severability clause. (Voter Guide, *supra*, text of Prop. 21, p. 131.)

Lastly, section 39 of Proposition 21 states, "The provisions of this measure shall not be amended by the Legislature except by a statute passed in each house by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, or by a statute that becomes effective only when approved by the voters." (Voter Guide, *supra*, text of Prop. 21, § 39, p. 131.)

### 2. *Analysis*

"The Legislature may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without the electors' approval." (Cal. Const., art. II, § 10, subd. (c).) As discussed, Proposition 21 allows the Legislature to amend its provisions but only "by a statute passed in each house by rollcall vote entered in the journal, two-thirds of the membership of each house concurring," or a statute approved by the electorate. (Voter Guide, *supra*, text of Prop. 21, § 39, 131.) There is no dispute that Assembly Bill 333 "was enacted without voter approval, and without the requisite two-thirds votes in both houses of the Legislature." (*People v. Lee*, *supra*, __ Cal.App.5th at p. __ [2022 Cal.App. LEXIS 624, *10.)

Does Assembly Bill 333 unconstitutionally amend Proposition 21? The People say the answer is yes, at least as applied to section 182.5. They concede Assembly Bill 333 made no changes to the text of section 182.5. (Compare Stats. 2021, ch. 699 with Voter Guide, *supra*, text of Prop. 21, § 3, p. 119.) However, certain elements of the gang conspiracy offense proscribed by section 182.5 are defined by incorporation of provisions that *were* amended by Assembly Bill 333, namely section 186.22, subdivisions (e) and (f). (See *People v. Kelly* (2010) 47 Cal.4th 1008, 1027 [holding an "amendment" in this context "includes a legislative act that changes an existing initiative statute by taking away from it"].)

"'In determining whether a legislative act has amended an existing statute, we examine and compare the provisions of the legislative act or new law with the existing statute.'" (*People v. Lippert* (2020) 53 Cal.App.5th 304, 311.) "'We simply need to ask whether [the statute] prohibits what the initiative authorizes, or authorizes what the initiative prohibits.'" (*Ibid*., quoting *People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571.) "We must interpret the law to ensure that the voters '"get what they

23.

enacted, not more and not less."' [Citation.] The voters' intent is our 'paramount consideration.'" (*Lippert*, at p. 311.)

We begin by examining Proposition 21 in light of the principle codified in Government Code section 9605: "If a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form. The portions that are not altered are to be considered as having been the law from the time when those provisions were enacted; the new provisions are to be considered as having been enacted at the time of the amendment; and the omitted portions are to be considered as having been repealed at the time of the amendment." (*Id*., subd. (a).)

In other words, "the parts of an amended statute that are copied without change are considered to have been part of the law all along and thus cannot be considered to be among the initiative's statutory provisions." (*People v. Superior Court* (*Ferraro*) (2020) 51 Cal.App.5th 896, 915; accord, *County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 209–210.) "When technical reenactments are required under article IV, section 9 of the Constitution—yet involve no substantive change in a given statutory provision—the Legislature in most cases retains the power to amend the restated provision through the ordinary legislative process. This conclusion applies *unless* the provision is integral to accomplishing the electorate's goals in enacting the initiative or other indicia support the conclusion that voters reasonably intended to limit the Legislature's ability to amend that part of the statute." (*Commission on State Mandates*, p. 214.) Our analysis, therefore, goes beyond simply looking at how section 186.22, subdivisions (e) and (f) differ today from the versions in Proposition 21. We focus instead on whether Proposition 21 substantively revised the preexisting definition of a "criminal street gang" and, if so, whether Assembly Bill 333 materially alters *those changes* to the definitional provisions.

Section 186.22, subdivision (e), defines the term "pattern of criminal gang activity" for purposes of the STEP Act. Proposition 21 reenacted this provision without

24.

substantive change to the first paragraph of the prior version except for adding the words, "conspiracy to commit." The full text of the Proposition 21 version is as follows: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, *conspiracy to commit*, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Voter Guide, *supra*, text of Prop. 21, § 4, p. 120, original italics.)

Proposition 21's addition of the words "conspiracy to commit" to the first paragraph of former section 186.22, subdivision (e) is unchanged by Assembly Bill 333. (See Stats. 2021, ch. 699, § 3.) The current version provides: "As used in this chapter, 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years *of the prior offense and within three years of the date the current offense is alleged to have been committed*, the offenses were committed on separate occasions or by two or more *members*, *the offenses commonly benefited a criminal street gang*, *and the common benefit of the offense is more than reputational*." (§ 186.22, subd. (e)(1), italics added.)

The italics above indicate Assembly Bill 333's substantive revisions to the first paragraph of former section 186.22, subdivision (e), which has been renumbered as subdivision (e)(1). The changes to the three-year "washout" period and the new "common benefit" requirement amend the law as it existed before and after Proposition 21. These amendments do not change any part of section 186.22, subdivision (e) that was

25.

enacted by Proposition 21.[4]  (See Gov. Code, § 9605, subd. (a); *County of San Diego v. Commission on State Mandates*, *supra*, 6 Cal.5th at pp. 209–210 ["Statutory provisions that are not actually reenacted and are instead considered to '"have been the law all along"' [citation] cannot fairly be said to be part of a ballot measure"].)

Proposition 21 made substantive changes to other parts of section 186.22 regarding the circumstances under which grand theft qualifies as a predicate offense. Those amendments to former subdivision (e)(9) and (10) of section 186.22 were reenacted by Assembly Bill 333 with identical text as subdivision (e)(1)(I) and (J). (Compare Stats. 2021, ch. 699, § 3 with Voter Guide, *supra*, text of Prop. 21, § 4, p. 120.) Proposition 21 also expanded the list of qualifying predicates to include criminal threats and violations of Vehicle Code section 10851.  (Former § 186.22, subds. (e)(24), (25); Voter Guide, *supra*, text of Prop. 21, § 4, p. 120.)  Those amendments were reenacted by Assembly Bill 333 with identical text as subdivision (e)(1)(V) and (W) of section 186.22. (Stats. 2021, ch. 699, § 3.)

Assembly Bill 333 did narrow the definition of a "pattern of criminal gang activity" by deleting from section 186.22 former subdivisions (e)(13) (looting), (e)(20) (felony vandalism), (e)(26) ("Felony theft of an access card or account information, as defined in Section 484e"), (e)(27) ("Counterfeiting, designing, using, or attempting to use an access card, as defined in Section 484f"), (e)(28) ("Felony fraudulent use of an access card or account information, as defined in Section 484g"), (e)(29) ("Unlawful use of personal identifying information to obtain credit, goods, services, or medical information, as defined in Section 530.5"), and (e)(30) ("Wrongfully obtaining Department of Motor

---

[4]The first paragraph of section 186.22, former subdivision (e) is further impacted by Assembly Bill 333's enactment of current subdivision (e)(2), which states, "The currently charged offense shall not be used to establish the pattern of criminal gang activity."  (Stats. 2021, ch. 699, § 3.)  However, reliance on currently charged offenses to establish a pattern of criminal gang activity predated Proposition 21 and was based on judicial interpretations of the "two or more" predicate offenses requirement, i.e., language reenacted without substantive change by Proposition 21.  (See *People v. Loeun* (1997) 17 Cal.4th 1, 4–5, 7, fn. 3, 9–10.)

Vehicles documentation, as defined in Section 529.7"). (Stats. 2021, ch. 699, § 3.) However, these changes do not unconstitutionally amend Proposition 21. The crimes listed in former subdivision (e)(26) through (e)(30) were not predicate offenses under Proposition 21; they were added as qualifying predicates by legislative amendment effective January 1, 2006.[5] (Stats. 2005, ch. 482, § 1.) Looting and felony vandalism, as previously discussed, became predicate offenses in 1994 (Stats. 1994, ch. 47, § 1), and their inclusion in section 186.22, former subdivision (e) is "considered as having been the law from the time when those provisions were enacted" (Gov. Code, § 9605, subd. (a)).[6]

Section 186.22, subdivision (f) defines the term "criminal street gang" for purposes of the STEP Act. Proposition 21 reenacted this provision without any changes to the prior version except to indicate that the number of qualifying predicate offenses

---

[5]The People make a point of the fact the Legislature amended section 186.22 in 2005, 2006, and 2009, and in every instance "specifically acknowledged the need for a two-thirds majority vote in each house [because of] Proposition 21." The discussion is misguided for two reasons. First, the Legislature's views regarding the legality of its enactments are not binding on the judiciary. (See *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 [legislative declarations are "neither binding nor conclusive in construing the statute. Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts"].) Second, the People concede Assembly Bill 333's amendments to section 186.22 are constitutional for purposes of that statute. The *Rojas* opinion reaches the same conclusion despite its holding as to section 190(a)(22). (See *Rojas*, *supra*, 80 Cal.App.5th at p. 557 [stating the "appropriate remedy is not to void Assembly Bill 333 in its entirety, but rather to disallow this unconstitutional application of Assembly Bill 333"].) If Assembly Bill 333 permissibly amends section 186.22, the Legislature's belief in the need for a supermajority vote to amend the statute on prior occasions—whether correct or not—is irrelevant.

[6]We are mindful that Proposition 21 amended the vandalism statute (§ 594) by reducing the threshold amount of damage qualifying the offense as a felony from $5,000 to only $400. (Voter Guide, *supra*, text of Prop. 21, § 12.5, p. 123; *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 906, fn. 14.) The ballot materials do not provide a reason for this substantial revision. But the amendment applies to all vandalism prosecutions, not just those of gang members, and nothing indicates that having felony vandalism continue to qualify as a predicate offense under section 186.22 was "integral to accomplishing the electorate's goals in enacting the initiative" (*County of San Diego v. Commission on State Mandates*, *supra*, 6 Cal.5th at p. 214). The People do not argue otherwise. Again, they maintain Assembly Bill 333 *did not* impermissibly amend section 186.22 and is unconstitutional only as applied to section 182.5.

27.

had risen.  The Proposition 21 version reads:  "As used in this chapter, 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to ~~(23)~~ *(25)*, inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (Voter Guide, *supra*, text of Prop. 21, § 4, p. 120, original italics and strikethrough text.)

Assembly Bill 333 amended section 186.22, subdivision (f) as follows:  "As used in this chapter, 'criminal street gang' means ~~any~~ *an* ongoing ~~organization~~, *organized* association~~,~~ or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in ~~paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of~~ subdivision (e), having a common name or common identifying sign or symbol, and whose members ~~individually or~~ collectively engage in, or have engaged in, a pattern of criminal gang activity."  (Stats. 2021, ch. 699, § 3, original strikethrough text, italics added.)  Because Proposition 21 made no substantive changes to subdivision (f) of section 186.22, Assembly Bill 333's additions and deletions are constitutionally permissible.  (Accord, *People v. Lee*, *supra*, __ Cal.App.5th at p. __ [2022 Cal.App. LEXIS 624, *13–*14] [holding "the voters left intact the Legislature's power to amend the definition of a criminal street gang in section 186.22, subdivision (f)"].)

As noted, the People contend "[Assembly Bill] 333's amendments of section 186.22, subdivisions (e) and (f), are only invalid as those amendments are applied to the criminal street gang conspiracy offense created by the voters in Proposition 21" and "remain valid as applied in other contexts."  This necessarily posits the Proposition 21 electorate generally intended to allow legislative amendments (by less than two-thirds approval in both houses) to section 186.22's definition of a "criminal street gang" for

purposes of that statute, but not for purposes of section 182.5. Yet the People fail to identify any evidence of such intent. Moreover, they claim it is unnecessary to "consider whether the practical effect of [Assembly Bill] 333 amends what the voters intended" in that regard. We disagree.

"Special rules of statutory interpretation govern how to apply a statute incorporating another statute that changes over time." (*Doe v. Saenz* (2006) 140 Cal.App.4th 960, 981.) "In *Palermo v. Stockton Theatres, Inc*. (1948) 32 Cal.2d 53 (*Palermo*), our Supreme Court set forth a seemingly categorical rule: '"It is a well established principle of statutory law that, where a statute adopts by specific reference the provisions of another statute, regulation, or ordinance, such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified."'" (*Saenz*, at p. 981.)

The People rely on *In re Oluwa* (1989) 207 Cal.App.3d 439, quoting an excerpt from *Oluwa* wherein the *Palermo* language is recited. "However, '"[t]he *Palermo* rule is not to be applied in a vacuum"' [citation], and the California Supreme Court has clarified that '*where the words of an incorporating statute do not make clear whether it contemplates only a time-specific incorporation*, "the determining factor will be … legislative intent."'" (*People v. Nash* (2020) 52 Cal.App.5th 1041, 1062, italics added.)

The California Supreme Court limited the *Palermo* holding in *In re Jovan B.*, *supra*, 6 Cal.4th 801, noting that while "[s]everal modern decisions have applied the *Palermo* rule," including *In re Oluwa*, "none have done so without regard to other indicia of legislative intent." (*Jovan B.*, at p. 816, fn. 10.) In the *Palermo* case itself, a time-specific intent was facially apparent from statutory provisions referencing "any treaty now existing." (*Palermo, supra*, 32 Cal.2d at pp. 57–60.) The *Jovan B*. line of authority—which the People fail to acknowledge in their briefing—thus holds "a formulaic application of the *Palermo* rule is inappropriate … when the incorporating statute does 'not make clear whether it contemplates only a time-specific incorporation.'"

29.

(*Doe v. Saenz*, *supra*, 140 Cal.App.4th at p. 981, quoting *Jovan B.*, at p. 816; accord, *People v. Nash*, *supra*, 52 Cal.App.5th at p. 1062; *People v. Fong* (2013) 217 Cal.App.4th 263, 267; *People v. Frawley* (2000) 82 Cal.App.4th 784, 794.) "[T]he question turns on legislative intent in light of all relevant evidence." (*Frawley*, at p. 794.) We therefore conclude the dispositive inquiry is the intent of the Proposition 21 electorate. (See *People v. Lee*, *supra*, __ Cal.App.5th at p. __ [2022 Cal.App. LEXIS 624, *12] [analyzing whether the voters "contemplate[d] a time-specific incorporation of the then-current version of section 186.22, subdivision (f), into the gang-murder special circumstance statute"].)

The first step in determining voter intent is "to scrutinize the statute's words, assigning them their usual and ordinary meanings and construing them in the context of the overall statutory scheme." (*People v. Spiller* (2016) 2 Cal.App.5th 1014, 1021.) "If the language of the statute allows for more than one reasonable interpretation, we will look to ""'other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet.'""" (*Ibid.*, quoting *People v. Briceno*, *supra*, 34 Cal.4th at p. 459; accord, *Robert L. v. Superior Court*, *supra*, 30 Cal.4th at p. 906.) The text of section 182.5 is not immediately helpful because its incorporation by reference of section 186.22, subdivisions (e) and (f) does not alone establish a time-specific intent. (See *In re Jovan B.*, *supra*, 6 Cal.4th at p. 816; *People v. Fong*, *supra*, 217 Cal.App.4th at pp. 266–267.) Because the reference is not made "in any time-specific way," we look to other indicators. (*Doe v. Saenz*, *supra*, 140 Cal.App.4th at p. 981.)

The Proposition 21 ballot materials "clearly show that the voters intended to dramatically increase the punishment for *all* gang-related crime" (*Robert L. v. Superior Court*, *supra*, 30 Cal.4th at p. 907), but they are virtually devoid of any references to the enactment of section 182.5. The statute is indirectly mentioned in one sentence that reads: "[Proposition 21] makes it easier to prosecute crimes related to gang recruitment, *expands the law on conspiracy to include gang-related activities*, allows wider use of

'wiretaps' against known or suspected gang members, and requires anyone convicted of a gang-related offense to register with local law enforcement agencies." (Voter Guide, *supra*, analysis of Prop. 21 by Legis. Analyst, p. 46, italics added.) However, as the recent *Lee* case observes, there is strong evidence of the voters' intent in language they used to amend certain provisions of the Three Strikes law. (*People v. Lee*, *supra*, __ Cal.App.5th at pp. __ [2022 Cal.App. LEXIS 624, *14-*15].)

Proposition 21 added section 667.1 to the Penal Code to read: "Notwithstanding subdivision (h) of Section 667, for all offenses committed on or after the effective date of this act, all references to existing statutes in subdivisions (c) to (g), inclusive, of Section 667, are to those statutes *as they existed on the effective date of this act*, including amendments made to those statutes by this act." (Voter Guide, *supra*, text of Prop. 21, § 14, p. 123, some italics omitted.) Section 1170.125 was likewise added to the Penal Code to read: "Notwithstanding Section 2 of Proposition 184, as adopted at the November 8, 1994 General Election, for all offenses committed on or after the effective date of this act, *all references to existing statutes in Section 1170.12 are to those statutes as they existed on the effective date of this act*, including amendments made to those statutes by this act." (Voter Guide, *supra*, text of Prop. 21, § 16, p. 124, some italics omitted.) By using time-specific language in both enactments, the voters "change[d] the 'lock-in' date for determining the existence of qualifying offenses (such as violent or serious felonies) under the Three Strikes law." (*Manduley v. Superior Court*, *supra*, 27 Cal.4th at p. 574.)

"'The enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted' [citation], 'and to have enacted or amended a statute in light thereof' [citation]." (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.) "'This principle applies to legislation enacted by initiative.'" (*Ibid*., quoting *People v. Weidert* (1985) 39 Cal.3d 836, 844; accord, *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283 [referring to both "'the drafters who frame an initiative

statute and the voters who enact it'"].)  Accordingly, and given the language used to enact sections 14 and 16 of Proposition 21, we agree with *Lee*'s conclusion that "the electorate clearly knew how to express the intent to freeze a statutory definition." (*People v. Lee*, *supra*, __ Cal.App.5th at p. __ [2022 Cal.App. LEXIS 624, *14].)  The absence of such time-specific language in section 182.5 leads to our rejection of the People's claim.  (Cf. *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 576 ["When the Legislature 'has employed a term or phrase in one place and excluded it in another, it should not be implied where excluded'"]; see *People v. Briceno*, *supra*, 34 Cal.4th at p. 459 ["'In interpreting a voter initiative … we apply the same principles that govern statutory construction'"].)  As there is no evidence compelling a different conclusion, we hold Assembly Bill 333's amendments to section 186.22, subdivisions (e) and (f) lawfully apply to section 182.5.

### D.     Section 1109[*]

At trial, the People preemptively moved in limine for a ruling that bifurcation of the gang enhancement allegations was not appropriate because gang evidence was necessary to prove the section 182.5 gang conspiracy charge.  Over a defense objection, the motion was granted.  In light of Assembly Bill 333's enactment of section 1109, defendant claims the trial court erred by not bifurcating the trial proceedings on the gang enhancement allegations *and* the gang conspiracy count.

As discussed above, section 1109 provides for bifurcated trial procedures in cases involving gang charges under section 186.22.  (§ 1109, subds. (a), (b).)  Section 1109 does not refer to section 182.5.  Whether section 1109 applies retroactively to nonfinal cases is an issue currently pending before the California Supreme Court in *People v. Tran* (S165998, argued May 25, 2022, submitted June 15, 2022).  Whether section 1109 has any application to section 182.5 has yet to be addressed by the appellate courts.  We need

---

[*]See footnote, *ante*, page 1.

32.

not reach either issue because, even assuming defendant is correct on both arguments, any error in failing to bifurcate the gang charges was harmless. Also, the gang conspiracy count and gang enhancement allegations are the only charges subject to retrial.

Relying on dicta in *People v. Burgos* (2022) 77 Cal.App.5th 550 at page 568 (rev. granted July 13, 2022, S274743), defendant argues failure to bifurcate gang charges in accordance with section 1109 is a structural error. Even in cases where this district has held section 1109 applies retroactively, the *Burgos* dicta has been rejected as unpersuasive. (E.g., *People v. Montano* (2022) 80 Cal.App.5th 82, 108; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1131–1133 [concluding § 1109 error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836].) First, "[t]here is a strong presumption that any error falls within the trial error category," i.e., is not structural and thus "subject to harmless error analysis." (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) Second, the right to bifurcation under section 1109 is purely statutory. (Cf. *People v. Hinton* (2006) 37 Cal.4th 839, 874 [describing right to a separate proceeding under § 190.1 as "merely statutory, not constitutional"].) "'Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result.'" (*Anzalone*, at p. 553; accord, *People v. Epps* (2001) 25 Cal.4th 19, 29 [where the error "is purely one of state law, the *Watson* harmless error test applies"].)

Defendant alternatively claims the alleged error violated his constitutional due process rights. We also disagree with this contention, but conclude the alleged error is harmless under the standard of *Chapman v. California* (1967) 386 U.S. 18. As argued in the People's briefing, the evidence of defendant's guilt on the counts that would have been bifurcated from the gang charges was overwhelming.

The audio recordings, text messages, video surveillance evidence, and eyewitness testimony clearly showed defendant's participation in a criminal conspiracy and his

attempt to commit the target offense of robbery. As for the firearm and ammunition counts, defendant was recorded saying he and his crew were "stocked up" on weapons and "strapped." Law enforcement witnesses testified "strap" is a slang term for gun and being "strapped" means to be armed with a gun. Defendant's presence in a car containing loaded firearms was conclusively established. There were five people in the car, and police recovered five guns. It is evident, beyond a reasonable doubt, that failure to bifurcate the gang charges did not affect the jury's verdicts.

## III. Retrial of Count 20[*]

Because Assembly Bill 333's amendments to the definition of a criminal street gang apply to section 182.5, count 20 must be reversed but is subject to retrial so long as the evidence was sufficient to prove the alleged gang conspiracy at the time of prosecution. (See *People v. Lopez*, *supra*, 73 Cal.App.5th at pp. 346–347; *People v. Rodriguez*, *supra*, 75 Cal.App.5th at p. 823, fn. 19.) In his opening brief, defendant argued the evidence was insufficient. The People agreed but argued for modification of the judgment to reflect a conviction of a lesser included offense. Defendant conceded the People's argument contingent upon the outcome of a related jury instruction claim and his separate challenge to the attempted robbery conviction. The claim of instructional error, which we previously rejected, is now moot. We must determine whether, as the parties contend, a conviction under section 182.5 can be based on a conspiracy to commit attempted robbery.

### A. Applicable Law

Section 182 proscribes the "traditional" form of criminal conspiracy. (*People v. Johnson* (2013) 57 Cal.4th 250, 257, 261–262 (*Johnson*).) The offense is defined as an agreement between two or more people to commit any crime, "together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in

---

[*]See footnote, *ante*, page 1.

furtherance thereof." (*People v. Swain* (1996) 12 Cal.4th 593, 600, quoting §§ 182, subd. (a)(1), 184.) In this context, an overt act is """"an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime."""" (*Johnson*, at p. 259, quoting *People v. Zamora* (1976) 18 Cal.3d 538, 549, fn. 8.)

A traditional conspiracy does not require completion of the crime the conspirators have agreed to commit. (*People v. Swain, supra*, 12 Cal.4th at p. 599.) "Once one of the conspirators has performed an overt act in furtherance of the agreement, 'the association becomes an active force, it is the agreement, not the overt act, which is punishable. Hence the overt act need not amount to a criminal attempt and it need not be criminal in itself.' [Citations.]" (*Johnson, supra*, 57 Cal.4th at p. 259.)

When section 182.5 was enacted by Proposition 21, it "created a new form of conspiracy that is distinct from the traditional understanding of the crime …." (*Johnson, supra*, 57 Cal.4th at p. 261.) Our Supreme Court has identified five differences between the two types of conspiracies. First, whereas a traditional conspiracy "encompasses a stand-alone agreement by former strangers to commit a single crime," a conviction under section 182.5 requires proof the defendant is "an active gang participant with knowledge of other members' pattern of criminal gang activity." (*Johnson*, at pp. 261–262.) Second, a section 182.5 conspiracy "relates only to the commission of a felony." (*Id.* at p. 262.) Section 182 refers to "'any crime'" and thus applies to conspiracies to commit misdemeanors. (*Ibid*.)

"Third, traditional conspiracy requires both the specific intent to agree, and specific intent to commit a target crime. [Citation.] A [section] 182.5 conspiracy does not require any prior agreement among the conspirators to promote, further, or assist in the commission of a particular target crime. Even without a prior agreement, an active and knowing gang participant who acts with the required intent to promote, further, or assist in the commission of a felony by other gang members can violate section 182.5.

35.

That act of assistance or promotion replaces the required prior agreement to commit a crime that is ordinarily at the heart of a traditional conspiracy." (*Johnson*, *supra*, 57 Cal.4th at p. 262.)

"Fourth, traditional conspiracy liability attaches once an overt act is committed. A [section] 182.5 conspiracy requires the actual commission of felonious criminal conduct as either an attempt or a completed crime." (*Johnson*, *supra*, 57 Cal.4th at p. 262.) "Fifth, section 182.5 brings within its ambit not only a gang member who promotes, furthers, or assists in the commission of a felony. It also embraces an active and knowing participant who merely benefits from the crime's commission, even if he or she did not promote, further, or assist in the commission of that particular substantive offense." (*Ibid.*)

## B.     Analysis

The verdict form for count 20 indicates defendant was convicted of "criminal street gang conspiracy, to wit:  robbery-in-concert, in violation of … sections 182.5, 212.5, and 213." (Capitalization omitted.)  However, as held in *Johnson*, the gang conspiracy statute requires "the actual commission of felonious criminal conduct as either an attempt or a completed crime." (*Johnson*, *supra*, 57 Cal.4th at p. 262.)  Since neither he nor his fellow gang members committed an actual robbery, defendant claims the evidence is insufficient to support the conviction.

The People agree with defendant but also contend the jury's verdicts supported a conviction of gang conspiracy based on the target offense of attempted home invasion robbery.  Defendant makes a qualified concession, stating "the possibility of reducing the gang conspiracy offense to the lesser included offense of gang conspiracy to commit attempted home invasion robbery would arise" if this court finds sufficient evidence to support the count 163 conviction of attempted first degree robbery, which we have already done.

36.

In a traditional conspiracy case, the defendant may be convicted of conspiring to commit a lesser crime included in the alleged target offense. (See *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1706.) Attempted robbery is a lesser included offense of robbery. (*People v. Crary* (1968) 265 Cal.App.2d 534, 540; see *People v. Webster* (1991) 54 Cal.3d 411, 443.) However, case law holds that conspiracy to commit an attempt crime "is a conclusive legal falsehood" and "nonexistent offense" because the underlying agreement would contemplate nothing more than "an ineffectual act." (*People v. Iniguez* (2002) 96 Cal.App.4th 75, 79.) On the other hand, *Johnson* instructs that section 182.5 "requires the actual commission of felonious criminal conduct as *either* an attempt *or* a completed crime." (*Johnson*, *supra*, 57 Cal.4th at p. 262, italics added.)

In *Johnson*, the California Supreme Court restated the holding of *People v. Iniguez* as follows: "[U]nder a traditional conspiracy approach, one cannot conspire to try to commit a crime. An agreement to commit a crime is required, even if nothing more than an overt act is ultimately done." (*Johnson*, *supra*, 57 Cal.4th at p. 264.) The high court's reference to the "traditional conspiracy approach" arguably suggests a different rule applies to section 182.5. Although courts have long understood the essence of a conspiracy to be the unlawful agreement (e.g., *People v. Marsh* (1962) 58 Cal.2d 732, 743), *Johnson* holds no such agreement is required to satisfy the elements of section 182.5. The "act of assistance or promotion replaces the required prior agreement to commit a crime that is ordinarily at the heart of a traditional conspiracy." (*Johnson*, at p. 262.) The People thus contend "it is possible to be guilty of a criminal street gang conspiracy to commit an attempted offense."

Based on *Johnson* and principles of stare decisis, we accept the parties' position. Section 182.5 requires proof of actual felonious conduct, and the evidence is insufficient to establish commission of the alleged offense (first degree robbery) by defendant or his fellow gang members. However, there is substantial evidence of defendant's commission of attempted first degree robbery, and that evidence satisfies the requirement of willful

37.

promotion, furtherance, and/or assistance in the commission of a felony. Defendant does not dispute the sufficiency of the evidence as to the remaining elements of the crime. Therefore, he may be retried on count 20 for a gang conspiracy based on the felonious conduct of attempted first degree robbery.[7]

## IV. Duplicative Convictions[*]

Counts 19 and 162 alleged conspiracy to commit home invasion robbery, i.e., traditional conspiracy liability under section 182, subdivision (a)(1). At trial, the People argued the agreement to commit robbery at two locations constituted two separate conspiracies. Defendant maintains the evidence showed only one conspiracy to commit two robberies. The Attorney General concedes this issue, and we accept the concession as appropriate. (See *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669 ["it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies"]; *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557 ["'One agreement gives rise to only a single offense, despite any multiplicity of objects'"].) Therefore, count 162 will be reversed for insufficient evidence.

## V. Sentencing Issues[*]

Defendant was sentenced to 35 years to life in prison for the count 19 conviction of (traditional) conspiracy to commit home invasion robbery. The sentence was imposed pursuant to section 186.22, subdivision (b)(4)(B), under which the punishment for a gang-related home invasion robbery is 15 years to life, and section 182, subdivision (a), under which conspiracy to commit a felony is "punishable in the same manner and to the same extent as is provided for the punishment of that felony." The base term was

---

[7]Shortly after our prior opinion in this case was issued, the Fourth Appellate District also held "it is possible to be guilty of a gang conspiracy to commit an attempted offense." (*People v. Ware* (2020) 52 Cal.App.5th 919, 946 (rev. granted on a different issue Dec. 9, 2020, S263923).)

[*]See footnote, *ante*, page 1.

[*]See footnote, *ante*, page 1.

doubled because of a prior strike and increased by five years because of a prior serious felony conviction.

A consecutive 19-year prison sentence was imposed for count 163 (attempted home invasion robbery), which represented one-half of the upper term of nine years (§§ 213, subd. (a)(1)(A), 664, subd. (a)) doubled for the prior strike and increased by a five-year gang enhancement (§ 186.22, subd. (b)(1)(B)) and the five-year prior serious felony conviction enhancement (§ 667, subd. (a)). Punishment on all other counts was either stayed or ordered to be served concurrently. The two prior prison term enhancements (§ 667.5, former subd. (b)) were ordered stayed pursuant to section 654.

## A. Punishment Under Section 186.22

In *People v. Lopez*, *supra*, 12 Cal.5th 957, the California Supreme Court determined the alternate penalties mandated by section 186.22, subdivision (b)(4) are reserved "for individuals convicted of the completed target offenses" specified therein and do not apply to conspiracy convictions. (*Lopez*, at p. 975.) On remand, defendant will "face up to nine years in prison" for conspiring to commit home invasion robbery, "with a serious felony enhancement of an additional five years [citations], as well as any additional punishment that might be applicable by operation of other enhancement provisions." (*Ibid.*) If the People elect to retry the section 186.22 enhancement allegations and they are found true, *Lopez* holds "[t]he most natural reading of Proposition 21 is that voters intended for conspiracies to commit gang-related robberies to be punished by an additional five years of imprisonment [under section 186.22, subdivision (b)(1)(B)]." (*Id*. at p. 973; see *id*. at p. 972 [citing § 186.22, subd. (b)(1)(B)].) If the People elect to retry count 20, i.e., the gang conspiracy charge, and defendant is convicted, he "may be punished as specified in subdivision (a) of Section 182." (§ 182.5.)

### B.    Senate Bill No. 1393

On September 30, 2018, the Governor approved Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill 1393), which amended sections 667 and 1385.  The legislation went into effect on January 1, 2019.  (Stats. 2018, ch. 1013, §§ 1–2.)  As a result, trial courts now have discretion under section 1385 to strike or dismiss the five-year sentencing enhancement prescribed by section 667, subdivision (a) for prior serious felony convictions.  Senate Bill 1393 applies retroactively in cases such as this one. (*People v. Stamps* (2020) 9 Cal.5th 685, 699.)  Therefore, at the time of resentencing on remand, the trial court shall consider whether to exercise its discretion to strike any of the prior serious felony conviction enhancements.

### C.    Miscellaneous Issues

The parties identify an error in the abstract of judgment regarding the number of prior serious felony conviction enhancements imposed at sentencing.  Since resentencing will occur on remand, a new abstract of judgment will be prepared.  Therefore, the issue is moot.

The parties do not discuss the prior prison term enhancements, but we note the trial court erred by staying the punishment for those enhancements.  When an allegation based on section 667.5, former subdivision (b) is found to be true, the trial court must either impose the additional prison term or strike the enhancement.  (*People v. Langston* (2004) 33 Cal.4th 1237, 1241.)  More importantly, effective January 1, 2020, the one-year enhancement provided for in section 667.5, former subdivision (b) is inapplicable to all prior prison terms except those served for a sexually violent offense within the meaning of Welfare and Institutions Code section 6600, subdivision (b).  (Stats. 2019, ch. 590, § 1.)

Senate Bill No. 483 (2021–2022 Reg. Sess.), which took effect January 1, 2022, reflects "the intent of the Legislature to retroactively apply … Senate Bill 136 of the 2019–2020 Regular Session to all persons currently serving a term of incarceration in jail

or prison for these repealed sentence enhancements." (Stats 2021, ch. 728, § 1.) Newly enacted section 1171.1 thus provides: "Any sentence enhancement that was imposed prior to January 1, 2020, pursuant to subdivision (b) of Section 667.5, except for any enhancement imposed for a prior conviction for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code is legally invalid." (§ 1171.1, subd. (a).) We leave it to the parties to address this issue on remand.

## DISPOSITION

Count 162 is reversed for insufficient evidence. Count 20 and all enhancement findings under section 186.22, subdivision (b), are reversed but subject to retrial. Defendant's sentence is ordered vacated and the matter is remanded for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed.

PEÑA, J.

WE CONCUR:

FRANSON, Acting P.J.

SMITH, J.

41.